No. 22-0378, *Brian Frye v. Erie Insurance Company*

ARMSTEAD, Justice, dissenting:

**FILED**
**June 12, 2024**
released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

I respect the majority's desire to abide by the general provisions of Rule 24(c) of the West Virginia Rules of Civil Procedure ("Rule 24(c)"), and do not dispute that notice to the Attorney General and the potential participation of the Board of Risk and Insurance Management ("BRIM") in this action may be helpful in resolving the matter before us. However, I am concerned with the majority's remand of this matter to require such notice at this late stage of the proceedings when no party timely and affirmatively raised a constitutional question. I believe that imposing such requirement, following a grant of summary judgment and denial of a motion pursuant to Rule 59(e) of the West Virginia Rules of Civil Procedure ("Rule 59(e)"), is not required by the rule, and I fear it will set a concerning precedent.

Following entry of summary judgment against him, Mr. Frye filed a Motion to Alter or Amend Judgment, pursuant to Rule 59(e). In that motion, he asserted for the first time that the circuit court had failed to address the constitutionality of the statutory scheme established by our Legislature regarding the role BRIM, a non-party, takes in the claims process for mine subsidence claims. In that motion, he advanced no argument that the West Virginia Attorney General should be given notice of this constitutional question pursuant to the provisions of Rule 24(c). Instead, the question of whether such notice is required was first raised by Respondent, Erie Insurance Company ("Erie"), in its response

1

to the Motion to Alter or Amend Judgment. A reading of the transcript of the pretrial hearing, where these issues were discussed, shows that Mr. Frye made the conscious choice not to assert any claims against BRIM. Because Mr. Frye decided what claims to assert, and he plainly decided to not assert any allegation against BRIM, challenge the constitutionality of the claims process, or seek intervention by the West Virginia Attorney General, the retroactive application of Rule 24(c) at the appellate stage of the action is untimely. Therefore, I dissent.

At the pretrial conference, it was the circuit court that raised the potential issue regarding the constitutionality of BRIM's involvement in the process of adjusting mine subsidence claims. Prior to that hearing, the record before this Court shows the parties briefed neither the constitutional issue nor the application of Rule 24(c). There was limited discussion of the potential constitutional issue at the pretrial hearing. However, Mr. Frye's counsel, even following the discussion at that hearing, did not request that notice be given to the Attorney General and had not directly raised the issue in any pleading, prior to the grant of summary judgment. Indeed, Mr. Frye clearly had the opportunity at the conclusion of the pretrial hearing to raise the constitutional issue and the application of Rule 24(c) prior to the circuit court's entry of summary judgment. He did not do so.

2

Moreover, no party raised the constitutional issue in their written memoranda addressing Erie's motion for summary judgment. Again, it was at the pretrial hearing that the circuit court first raised the constitutional issue. During this discussion at the pretrial hearing, it is clear that counsel for Mr. Frye was aware of the constitutional conundrum yet chose to not pursue it. The circuit court began its discussion by simply raising a question about the process through which mine subsidence claims are processed:

> THE [CIRCUIT] COURT: You're saying – by that statement, to me it sounds almost like a constitutional argument, is what you're arguing, that the legislature could not authorize by statute a delegation, constitutionally, of an insurer's duty of fair dealing with its insured, by handing some adjustment over to a separate outfit like BRIM.
>
> [Counsel for Mr. Frye]: I think that's part of it, I think that's one prong of it, Your Honor, and one reason that they can't. But the other is that the code specifically provides for the insurer to handle and settle the claim in the customary manner. But the other is that the code specifically provides for the insurer to handle and settle the claim in the customary manner. And that's where the difficulty is. They specifically say we're a reinsurer. That's why they have insurance companies do it, Your Honor, to be quite frank.
> Let's look at this from a practical standpoint, though. If BRIM was truly the ones that – if the insurance company had no authority to do anything, there would be no reason to involve the insurance companies. There would just be a fund set up by the state, and you would make a claim to that fund when you have mine subsidence, and then BRIM would make a decision, and you either get money from the state or you wouldn't.

3

The discussion of the BRIM statutory process turned to whether insureds have a remedy:

> [Counsel for Erie]: What I'm saying, Your Honor, is that when a mine subsidence claim is submitted, the carrier is statutorily obligated to assign to BRIM the investigation and coverage determination of that mine subsidence claim. In this case Erie did that. Erie hired its own engineer to investigate whether there were any other possible covered causes or whether it was mine subsidence, and Erie sent the delay letter every month to Mr. Frye, telling him his claim was still being investigated by BRIM for mine subsidence coverage. And when Erie got BRIM's engineer's report, Erie issued a denial letter. So it's not as if Erie just sent it to BRIM and did nothing.
>
> . . . .
>
> THE [CIRCUIT] COURT: [P]otentially its bad faith if – and again, I'm throwing this word out loosely – [Erie is] not immune in a mine subsidence case. The way I'm reading this potentially is – and I'm not making this finding yet – once a claim is made under mine subsidence and they refer it to BRIM, I don't think they have a duty to keep you informed of squat, potentially, as unfair as that may seem.
>
> [Counsel for Mr. Frye]: Well, and that comes to my third point, which is if the law is to be interpreted that way, then you have a whole bunch of West Virginians with no remedy.
>
> THE [CIRCUIT] COURT: I agree.
>
> [Counsel for Mr. Frye]: And that's a problem. That's clearly not what was intended by the statute is that, look, you know, hey, you can go purchase mine subsidence coverage all you want, and BRIM—

4

THE [CIRCUIT] COURT: Can do whatever it wants and you're screwed.

[Counsel for Mr. Frye]: Yeah, BRIM can do whatever it wants and you got no remedy.

THE [CIRCUIT] COURT: Even in first party. It seems completely crazy to me, which goes back to my constitutional suggestion. Are you actually maybe suggesting that the manner in which this was written is unconstitutional, which is why I think [Counsel for Erie] is saying, hey, let's pull the reins in here, I'm not arguing complete immunity, I'm trying to pin all this and keep the argument much more sustainable on appeal than what you guys are maybe throwing out.

Counsel for Erie then appeared to take the position that the lack of a remedy was irrelevant because Erie followed the Legislative construct:

[Counsel for Erie]: I'll take them backwards. In regard to West Virginia being without a remedy, Your Honor, I don't really feel that that is – while [Counsel for Mr. Frye] may have a valid point, that is not the legislative scheme that is in place. The legislative scheme was put in place because no insurance carriers would write mine subsidence coverage. So[,] the State of West Virginia developed a plan to collect premiums, create a fund, investigate and pay out valid mine subsidence claims. That's the West Virginia legislature that created that plan. Erie followed it to a T.

THE [CIRCUIT] COURT: Okay. And forgive my ignorance. Is there actually a remedy in administrative appeals, or no?

[Counsel for Erie]: Your Honor, I don't know that answer to that, to tell you the truth. I will tell you in this case when Mr. Frye complained, BRIM came back out two years later and hired a second consultant, this time a geologist. Three

5

people from EEI Geophysical came out. They again two years later independently concluded no evidence of mine subsidence. So[,] there is some kind of procedure that BRIM was willing to hire a second consultant to come out and review, but the results were the same, no mine subsidence.

Counsel for Mr. Frye, however, maintained that his only remedy was a breach of contract claim against the insurer, Erie, and the issue of whether there was mine subsidence was a jury question:

> [Counsel for Mr. Frye]: Without question, without question, regardless of how it's set up, whether it's because of a statutory scheme or whatever, Erie issued a contract, a policy of insurance to my client, and my client has to be able to – you asked a good question. So what's my client supposed to do? You can't just go to the state and say, hey, give me this money. The only thing you can do is go to Erie. So regardless of whether they think they can be held in bad faith or whether the decision's like, hey, our hands are tied because of BRIM, those are all defenses to a bad faith claim.
> But the breach of contract claim, the only thing my client can do is file a claim for those benefits with Erie. They can't file it directly with the state. File it with Erie, and if those aren't paid, file a breach of contract claim. And that's the initial thing here, which is that my client still hasn't been paid his benefits or had an opportunity to have that heard. And we have an expert to testify --
>
> THE [CIRCUIT] COURT: Which is why this is about immunity. You guys can couch it any way you want, this is about immunity. The argument is the same for both. There is no breach of contract claim, [Counsel for Mr. Frye], if they have no duty to adjust and investigate and make a decision on whether the claim is valid.
>
> [Counsel for Mr. Frye]: *I disagree, Your Honor.*

6

THE [CIRCUIT] COURT: How could you?

[Counsel for Mr. Frye]: *Because with respect to – that goes to the bad faith. You don't even need a duty for a breach of contract. You know, we're talking about tort, you know, in terms of the duty. But a contractual relationship says, hey, you pay this, I'll do this in exchange. And the contract was you pay premiums, you have mine subsidence, we'll pay you the benefits.*

THE [CIRCUIT] COURT: If it's covered, yeah.

[Counsel for Mr. Frye]: If it's covered. But this is my client's only mechanism for determining whether that's covered. My client didn't get to have a hearing in front of BRIM or present anything in front of BRIM. And my client has no contract with BRIM.

THE [CIRCUIT] COURT: No. But [Counsel for Erie's] position is that her client didn't have a chance to even weigh in on whether it was covered or not. So[,] I understand both arguments, believe me. I understand [Mr. Frye] didn't have a chance, and I think it's unfair, but I have to make a determination as the court to figure out if [Erie] even had a chance to weigh in legally on whether they breached the contract. And if [Erie]'s hands are now tied, how is it fair that you can sue them for breach of contract?

[Counsel for Mr. Frye]: And I can answer that.

THE [CIRCUIT] COURT: I think this whole scheme seems to be a little screwed up.

[Counsel for Mr. Frye]: Perhaps. I would tend to agree with that, that it's a screwed up scheme. *But given the scheme that it is, the fact of the matter is that there was a contract between Erie and [Mr.] Frye.*

THE [CIRCUIT] COURT: No doubt.

7

[Counsel for Mr. Frye]: Under any contract, any contract, all right, the question is, all right, are you doing your part, basically. I'll summarize it in simple terms. My client clearly paid his premiums. Nobody disputes that. *The only question now is, all right, was there mine subsidence. And that's a jury question, that's absolutely a jury question as to whether there was mine subsidence. If there was mine subsidence they owe that money to him, right?*

THE [CIRCUIT] COURT: So now we're going to let the jury decide whether BRIM made the appropriate decision?

[Counsel for Mr. Frye]: Not really. The jury is going to decide whether there was mine subsidence.

(emphasis added).

As illustrated by this colloquy during the pretrial conference, it is clear that counsel for Mr. Frye was aware at that time that there could possibly be a constitutional issue in this case. The remaining portions of the transcript of the pretrial hearing indicate that he was also aware of the potential for filing a declaratory judgment action to address this issue and was aware of the possibility of certifying a question to this Court, all as avenues to place the constitutional issue squarely into question. Yet, counsel for Mr. Frye took no steps to formally raise the constitutional question. Instead, he waited until the circuit court entered summary judgment against Mr. Frye. It was then, for the first time, that he raised the constitutional issue in his Motion to Alter and Amend Judgment. Even still, counsel for Mr. Frye made no suggestion of the application of Rule 24(c). It was Erie

8

who raised the potential applicability of Rule 24(c) in its response to the Rule 59(e) motion, alleging that Mr. Frye had waived its application.

The majority opinion cites to a Supreme Court of Tennessee case in footnote 23 for the proposition that the circuit court is a gatekeeper for enforcing the requirements of Rule 24(c). *See In re Adoption of E.N.R.*, 42 S.W.3d 26 (Tenn. 2001). In doing so, the majority cited the statement of the Tennessee court that "the trial court functions as a 'gatekeeper to inquire whether notice has been provided to the Attorney General by the challenger and to suspend proceeding on the constitutional challenge until such notice has been provided and a response from the Attorney General received.'" Maj. Op. n 23. A full review of the discussion contained in the *E.N.R.* opinion, however, reveals that a key factor of a court's gatekeeper function is a determination of the timeliness of the request to invoke Rule 24(c). As the majority states, the court in *E.N.R.* found:

> Nevertheless, the *court* is required, pursuant to Tenn. R. Civ. P. 24.04,[1] to ensure that notice of the constitutional challenge has been provided to the Office of the Attorney

_____

[1] Tennessee Rule of Civil Procedure 24.04 is substantially similar to the provisions of West Virginia Rule of Civil Procedure 24(c). The Tennessee Rule provides:

> When the validity of a statute of this state or an administrative rule or regulation of this state is drawn in question in any action to which the State or an officer or agency is not a party, the court shall require that notice be given the Attorney General, specifying the pertinent statute, rule or regulation.

General. This rule makes it clear that the trial court sits as gatekeeper to inquire whether notice has been provided to the Attorney General by the challenger and to suspend proceeding on the constitutional challenge until such notice has been provided and a response from the Attorney General received.

*Id.*, at 33 (emphasis in original). This language is followed by important limiting language. The majority dismisses the additional language contained in the *E.N.R.* decision as only "being part of *the separate issue* of whether the appellant had waived his constitutional argument." However, the paragraph *immediately following* the excerpt cited by the majority specifically states that the untimeliness of the "mention" that the statute in that case might be unconstitutional obviated any duty on the part of the trial court to *provide the notice* required under Rule 24.04:

The trial court in this case did not err, however. It is unreasonable to expect a trial court to suspend a proceeding upon the untimely mention by counsel that a statute is unconstitutional. *A court is obligated to ensure compliance with the notification rules only after the question of constitutionality has been put properly at issue by the challenger. Because the challenge in this case was not timely raised, the trial court had no obligation under Tenn. R. Civ. P. 24.04.*

*Id.*, at 33-34 (emphasis added). This qualifying language expressly limits the court's duty under Rule 24 when the parties fail to timely raise a constitutional issue. Indeed, the issues of the constitutionality of the statute and the notice required to be given the Attorney General are inextricably intertwined. It is the question of constitutionality that triggers the Rule's application and the duty to timely raise the issue rests upon the party asserting the

10

question of constitutionality.[2] In *E.N.R.*, the constitutional challenge was not raised until closing argument at trial. *See id.*, at 29. Because of such delay in raising the issue, the Tennessee Supreme Court concluded that the challenge was not preserved for appeal:

> The record shows that the constitutional challenge in this case was late-raised, minimally addressed, characterized by counsel as mentioned only for the purpose of preserving it for appeal, and perhaps was simply a last ditch effort to overcome the court's preliminary findings in favor of the opposition. To now rely upon the importance of this issue as grounds for appellate review is near hypocrisy given the short shrift it received at trial where it could have, and should have, been fully adjudicated.

*Id.*, at 32. Further, following *E.N.R.*, Tennessee courts have consistently held that notice to the Attorney General is not required when the request for Attorney General involvement is untimely:

---

[2] Another Tennessee case cited in footnote 23 of the majority opinion is distinguishable from the present case. *See Shelby Cnty. v. Delinq. Taxpayers 2018*, No. W202300446COAR3CV, 2024 WL 1944737 (Tenn. Ct. App. May 3, 2024) ("*Shelby County*"). In *Shelby County*, the issue of notice to the Tennessee Attorney General was first raised on appeal because of a "recent case decided and filed in the Sixth Circuit Court of Appeals." *Id.* at *2. The lower court completed its review of *Shelby County* on June 29, 2022. *See id.* The "recent case" noted in *Shelby County* was not handed down by the Sixth Circuit until October 10, 2022, five months after the lower court in *Shelby County* had issued its ruling. *Compare id. with Hall v. Meisner*, 51 F.4th 185, 187 (6th Cir. 2022), *reh'g denied,* No. 21-1700, 2023 WL 370649 (6th Cir. Jan. 4, 2023), and *cert. denied sub nom. Meisner v. Tawanda Hall*, 143 S. Ct. 2639 (2023), and *cert. denied,* 143 S. Ct. 2638 (2023). An issue raised for the first time on appeal because of another court's opinion that was not in existence at the time a case was before a trial court is dramatically different from when, as here, the parties were fully aware of an issue and chose not to raise it before the trial court.

In the *Adoption of E.N.R.* opinion, the High Court stated 'there is little difference between an issue improperly raised before the trial court at the last minute and one that was not raised at all.' Counsel in the *Adoption of E.N.R.* case had raised a question about the constitutionality of a statute only in closing argument in hope of preserving the issue for appeal. The Supreme Court held 'that the Court of Appeals properly refused to consider the [belated] constitutional challenge.' The Court also discussed the inability of the trial court to act 'as gatekeeper to inquire whether notice has been provided to the Attorney General' when the issue is not properly raised in the trial court.

*Miltier v. Bank of Am., N.A.*, No. E2010-00537-COA-R3CV, 2011 WL 1166746, at \*4 (Tenn. Ct. App. Mar. 30, 2011) (citations omitted) (bracket in original).

In *In re Adoption of E.N.R.*, the defendant never raised the constitutional issue in a pleading or motion. And after carefully reviewing the record, the supreme court concluded that the defendant 'raised no constitutional challenge whatsoever until closing argument.'

*Yebuah v. Ctr. for Urological Treatment, PLC*, No. M201801652COAR3CV, 2020 WL 2781586, at \*4 (Tenn. Ct. App. May 28, 2020), *rev'd on other grounds,* 624 S.W.3d 481 (Tenn. 2021) (citation omitted).

Similarly, here there was no legitimate justification for Mr. Frye's failure to properly raise the constitutional issue prior to the entry of summary judgment. Mr. Frye knew of the constitutional dilemma and did nothing. "[T]he party who brings a suit is master to decide what law he will rely upon. . . ." *The Fair v. Kohler Die & Specialty Co.*,

12

228 U.S. 22, 25 (1913). Here, Mr. Frye chose to bring a breach of contract claim against Erie, despite having full knowledge of the constitutional issue and BRIM's role in the statutory scheme. Moreover, the circuit court effectively invited the parties to raise the constitutionality of the statute more formally, and Mr. Frye chose, as indicated by the transcript of the hearing, to simply pursue his breach of contract action against Erie.

The requirements of notice to the Attorney General outlined in Rule 24(c) are implicated when a constitutional issue is, as the rule expressly provides, "drawn in question" in a case. Here, the constitutionality of the statutory process was merely discussed in a passing fashion at the pretrial hearing, and it was neither raised in Mr. Frye's complaint, nor was it formally asserted in any pleading prior to the grant of summary judgment. Under such circumstances, I do not believe the constitutional issue was adequately "drawn in question" to require the circuit court to provide notice to the Attorney General.

Notice to the Attorney General is admittedly an important step when the constitutionality of a statute is properly and timely placed before a court for a determination of whether such statute is violative of constitutional provisions. However, I believe the majority's decision to remand this case for notice to the Attorney General at this late stage,

13

based on nothing more than a mere discussion of constitutional concerns at a hearing, takes this Court down a slippery slope.  Therefore, I respectfully dissent.